**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **No. 1:10-cr-00179** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **CHARLES HERMAN STATEN,** | : | |
|     **Defendant** | : | |

## <u>MEMORANDUM</u>

On January 19, 2011, a grand jury for the Middle District of Pennsylvania issued a superseding indictment against Defendant Staten, charging him with distributing or possessing with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1) and conspiring to distribute or possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846. (Doc. No. 28.) On August 9, 2012, following a four-day jury trial at which he represented himself, Defendant was found guilty of both offenses. (Doc. No. 256.) On August 14, 2012, the Court appointed counsel to represent Defendant in post-trial matters. (Doc. No. 259.) Now before the Court are two motions for a new trial under Rule 33 of the Federal Rules of Criminal Procedure: one filed by appointed counsel (Doc. No. 290) and one filed by Defendant himself (Doc. No. 289). For the reasons stated more fully herein, the Court will deny both motions.

## I.   BACKGROUND

### A.   Procedural Background

Before Defendant elected to represent himself at trial, the Court made four successive separate appointments of CJA counsel to represent him. Three of those attorneys filed motions to withdraw as counsel because Defendant refused to cooperate with them. (Doc. No. 22 ¶ 4; Doc. No. 78 ¶ 6; Doc. No. 176 ¶ 6; Doc. No. 234.) Following the withdrawal of each counsel, Defendant was admonished concerning the necessity of cooperating with counsel. In January

1

2012, Defendant began filing letters with the Court, many of which contained disparaging remarks about the undersigned and Attorney Steve Rice, the fourth attorney appointed to represent him. (See Doc. Nos. 161, 175, 202, 223, 224, 226, 227.) Recurrent themes in these letters were Defendant's extreme dissatisfaction with Attorney Rice's performance and Defendant's desire to represent himself at trial. The Court held hearings to address these issues on February 3, 2012, March 2, 2012, and June 14, 2012.

At the February 3, 2012 hearing, Defendant initially expressed a desire to represent himself at trial. The undersigned then began to conduct an on-the-record colloquy with Defendant, in accordance with Faretta v. California, 422 U.S. 806 (1975), and United States v. Peppers, 302 F.3d 120 (3d Cir. 2002), to ensure that Defendant's waiver of the right to counsel was knowing, voluntary, and intelligent. As the colloquy neared conclusion, Defendant interrupted to volunteer that he desired to retain the services of Attorney Rice. Approximately three weeks later, Attorney Rice filed a motion to continue trial, indicating that Defendant refused to speak with him or assist with trial preparation. (Doc. No. 176.) The Court held a hearing on March 2, 2012 to address the motion, during which Defendant again expressed dissatisfaction with Attorney Rice's performance and requested to proceed pro se. The Court deferred making a final determination regarding Defendant's request pending review of a competency evaluation. (Doc. No. 192.)

Upon review of the competency evaluation, which indicated that Defendant was competent to stand trial, the Court held a hearing on June 14, 2012. During this hearing, Defendant was highly agitated, insolent, and unwilling to engage in a meaningful discussion with the undersigned. Defendant, however, did make abundantly clear that he wished to represent himself at trial. Despite the undersigned's attempts to again inform him of the consequences of

waiving his right to counsel, Defendant spoke over, and refused to listen to, the undersigned and demanded to be excused. Accordingly, the Court concluded the hearing and granted Attorney Rice leave to withdraw as Defendant's counsel, a decision made in light of Defendant's repeated requests to represent himself[1] as well as Defendant's distrust and even hatred of counsel expressed in a letter filed on May 22, 2012.[2]

On June 25, 2012, the Court issued an order addressing Defendant's various requests for relief, many of which appeared to relate to the "redemption" theory,[3] which has been uniformly rejected by courts across the United States.[4] (Doc. No. 234.) In accordance with <u>Faretta</u> and <u>Peppers</u>, the Court outlined in detail that, <u>inter alia</u>: (1) the Court could not advise Defendant as to how he should try his case or provide him with any legal advice; (2) an attorney may be aware

---

[1] <u>See</u> Doc. No. 223 at 1-2 ("I want to assume the position as pro-se counselor . . . [and] I wish to go pro-se at any of my upcoming hears"); Doc. No. 224 at 2 ("Now that I am considered as pro-se counsel by the courts . . . ."); Doc. No. 226 at 7 ("The judge may consider [Attorney Rice] as my counsel, but I don't . . . and I never will. At all other court proceedings, [Attorney Rice] wont be representing me, as long as I have a right to represent myself.").

[2] <u>See</u> Doc. No. 226 at 3 ("I really do dislike you sir, due to the fact of what you represent, my dislike for you is so intense that I can truly say that I hate you . . . ."); <u>id.</u> at 6 ("You conspired with the prosecutor's shenanigans to fraud me and the courts. As soon as I have another conference with my civil lawyer we will contrive a very prosperious tactic to sue you, stop your bond company's protection for you, create a strategy that will put you in a predicament of becoming liened . . . ."); <u>id.</u> ("Sir, you wake up everyday and have the audacity to call yourself a defense attorney, yet on the contrary, you're the epitome of a crook, conspiring with the probate and the declarant to commit all kinds of crimes consisting of forgery, treachery, treason, racketeering, misappropriation of funds, and being tax fugitives.") (errors in original).

[3] The United States District Court for the Eastern District of Pennsylvania has described the redemption theory as "an anti-government scheme that utilizes commercial law to harass and terrorize its targets. It is increasingly popular among prison populations . . . [and] advocates that an individual can 'redeem' himself through the filing of commercial documents." <u>Monroe v. Beard</u>, No. 05-cv-04937, 2007 WL 2359833, at *2 (E.D. Pa. Aug. 16, 2007).

[4] <u>See, e.g.</u>, <u>United States v. Ornelas</u>, No. 05-cr-321, 2010 WL 466385, at *1 (S.D. Ala. Nov. 9, 2010); <u>Luster v. United States</u>, No. 03-cr-52, 2010 WL 3927786, at *2 (M.D. Ga. Apr. 12, 2010); <u>Black v. Florida</u>, No. 09-cv-30, 2009 WL 1605410, at *3 (N.D. Fla. June 4, 2009); <u>United States v. Mitchell</u>, 405 F. Supp. 2d 602, 604 (D. Md. 2005).

of ways of defending against the charges that may not occur to Defendant; (3) the Federal Rules of Criminal Procedure and the Federal Rules of Evidence would apply at trial; (4) Defendant would need to proceed at trial by calling witnesses and asking them questions; and (5) a trained attorney would defend Defendant far better than he could defend himself. (Id. at 13.) The order also outlined the charges against Defendant and the penalties associated with them, including that the Government had asserted that it would seek an enhanced sentence based on his prior felony drug offenses. (Id. at 14-15.) Finally, the order advised Defendant that the Court was willing to appoint Attorney Rice as standby counsel if Defendant assented to such an appointment in a written filing. (Id. at 16-17.) Defendant did not do so.

### B. The Trial

During the course of a four-day jury trial, which commenced on August 6, 2012, Defendant represented himself. Numerous witnesses testified that Defendant sold crack cocaine. (Doc. No. 267 at 44:11-22; Doc. No. 268 at 166:15-25, 175:21-24, 182:4-5, 182:18-23, 207:1-25, 210:7-13.) In particular, Benjamin Thomas testified that he purchased crack cocaine from Defendant, that he introduced Defendant to Jamelle Brooks, and that he drove Defendant to meet Mr. Brooks on about five different occasions. (Doc. No. 268 at 219:22-25, 222:8-17, 223:1-8, 223:18-19, 224:18-20.) Mr. Brooks testified that he sold crack cocaine to Defendant and that Mr. Thomas and Monica Jones would sometimes accompany Defendant at these transactions. (Id. at 233:18-21, 235:11-17, 242:1-4.) Ms. Jones also testified that she acted as Defendant's "middleman" and, upon Defendant's request, would purchase crack cocaine from Mr. Brooks. (Id. at 247:24-25, 248:1-2, 249:5-7, 254:6-7.) According to Mr. Brooks, his source of crack cocaine was an individual referred to as "Bodie." (Id. at 234:21-24.)

The bulk of the trial testimony concerned drug transactions involving Defendant that occurred on August 10, 2009, February 1, 2010, February 3, 2010, May 24, 2010, and May 25, 2010. With respect to the first transaction, Pennsylvania State Trooper John Brumbaugh and Clarissa Smith, then a confidential informant, testified that Ms. Smith purchased crack cocaine from Defendant on August 10, 2009. (Doc. No. 267 at 6:13-16, 10:1-4; Doc. No. 268 at 68:10-12, 69:4-10, 70:6-12.) Ms. Smith testified that she arranged the transaction by contacting a woman named Natasha who, in turn, contacted Defendant. (Doc. No. 267 at 10-17; Doc. No. 268 69:4-10.) After making the arrangements, Ms. Smith traveled with Natasha and Trooper Brumbaugh to a gas station in Fayetteville, Pennsylvania. (Doc. No. 267 at 12:14-20; Doc. No. 268 at 70:6-12.) Upon their arrival, Ms. Smith handed $230 to Natasha, who then met Defendant and returned to the car with a Styrofoam cup containing a plastic bag filled with crack cocaine. (Doc. No. 267 at 12:14-20, 13:1-2.)

Regarding the January 28, 2010 transaction, Franklin County Detective Darren North testified that he worked with a confidential informant to purchase crack cocaine from Tami Diller. (Doc. No. 268 at 83:13-24, 84:21-24, 86:3-4.) According to Detective North, Ms. Diller told the informant that Defendant was her source of supply. (Id. at 87:19-20.) Chambersburg Police Officer Anthony Rosenberry testified that he assisted Detective North with surveillance on this date and saw Defendant enter Ms. Diller's residence. (Id. at 195:7-25, 196:4-6.)

With respect to the February 2010 transactions, Trooper Brumbaugh and Ms. Smith testified that Ms. Smith, again acting as a confidential informant, purchased crack cocaine from Defendant. (Doc. No. 267 at 18:12-17, 25:14-17.) On February 1, 2010, she met Defendant in the parking lot of a pharmacy located in Chambersburg, Pennsylvania. (Id. at 21:11-19.) At the time of this meeting, Trooper Brumbaugh, Detective North, and Officer Rosenberry were in the

vicinity. (Id. at 22:3-6.) After purchasing the crack cocaine from Defendant, Ms. Smith wrote the following handwritten note, which both she and Trooper Brumbaugh read at trial upon the direction of counsel for the Government: "I met with Brumbaugh, afterwards meet with Chuck, gave him $100 for cocaine and returned to Brumbaugh, Clarissa Smith, 2010, February 1st, at 7:15 p.m., called (717) 465-6510." (Id. at 24:15-19; Doc. No. 268 at 73:2-4.) On February 3, 2010, Ms. Smith met Defendant at the same location. (Doc. No. 267 at 26:21-25, 27:1.) Prior to this transaction, Trooper Brumbaugh requested Agent Keith Kierzkowski of the Drug Enforcement Agency to assist in the investigation of Defendant. (Id. at 26:1-4.) After buying the crack cocaine, Ms. Smith wrote the following handwritten note, which both she and Trooper Brumbaugh read at trial upon the direction of Government counsel: "I met with Brumbaugh and received a hundred dollars to buy cocaine, then meet with Chuck and the – bought the cocaine and returned to Brumbaugh, Clarissa Smith, 2/3/2010, time 4:40 p.m. The phone number she called was (717) 465-6510." (Id. at 27:15-23; Doc. No. 268 at 72:25, 73:1-4, 73:7-9.)

According to Detective North, on May 24, 2012, he instructed Joseph Jerome Johnson, a confidential informant, to purchase crack cocaine from Defendant. (Doc. No. 268 at 104:9-12.) Mr. Johnson met Defendant in a parking lot in Chambersburg and wore a recording device during the transaction. (Id. at 106:1-25, 107:1-24; Doc. No. 269 at 292:21-23, 294:24-25, 295:1-2.) Following the transaction, Mr. Johnson wrote the following note, which both he and Detective North read at trial upon the direction of Government counsel: "I called Chuck, made a $200 deal at Rite Aid, 222-6294. He got in my car to do the deal. I dropped him off on Lincoln Way East by the post office." (Doc. No. 268 at 116:14-16; Doc. No. 269 at 298:3-6.)

Mr. Johnson also testified that he purchased crack cocaine from Defendant at two different times on May 25, 2012. (Doc. No. 269 at 21-25, 299:1-13.) After these transactions,

Mr. Johnson wrote notes, which he read at trial upon the direction of Government counsel. The first note states: "5/25/2010 . . . I called Chuck to get $200 worth of dope. I met him across from the Rite Aid on Lincoln Way East. He got in my car, rode around the block, and made the deal. He was dropped off by a white van." (Id. at 21-25, 299:1.) The second provides: "5/25/2010. I met with Chuck on Washington and Fourth. He got – and got a hundred dollars' worth of dope. He got in my car, and I dropped him off on Fourth Street." (Id. at 299:11-13.)

Defendant was arrested on June 16, 2010. (Doc. No. 268 at 10-12.) Detective North testified that he confiscated Defendant's keys, currency, and mobile phone and took photographs of the list of recent calls on Defendant's phone. (Id. at 121:12-14, 123:12-13, 124:5-7.) The list of calls included calls to an individual named "King," a known alias of Mr. Brooks. (Id. at 123:12-13, 124:5-7.)

On August 9, 2012, the jury found Defendant guilty of possessing with intent to distribute crack cocaine and conspiracy to distribute or possess with intent to distribute crack cocaine. (Doc. No. 256.) On August 14, 2012, the Court appointed counsel to represent Defendant in any post-trial matters. (Doc. No. 259.) Defendant's appointed counsel filed a motion for a new trial on October 21, 2012. (Doc. No. 290.) Two days earlier, Defendant filed a pro se motion for a new trial. (Doc. No. 289.)

## II.     STANDARD OF REVIEW

Rule 33(a) of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The decision to grant or deny a motion for a new trial lies within the discretion of the district court. United States v. Vitillo, 490 F.3d 314, 325 (3d Cir. 2007). Rule 33 motions, however, are "not favored and should be granted sparingly and only in exceptional

cases." United States v. Silveus, 542 F.3d 993, 1005 (3d Cir. 2008). Exceptional cases are those in which trial errors, either individually or in combination, "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial" or were so serious that they resulted in a miscarriage of justice. Id.; United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993). "Given 'the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial.'" United States v. Zehrbach, 47 F.3d 1252, 1265 (3d Cir. 1995) (quoting United States v. Hasting, 461 U.S. 499, 508-09 (1983)).

## III.    DISCUSSION

Defendant raises a multitude of grounds in support of his motion for a new trial. The Court will first address the following grounds raised in the motion filed by Defendant's appointed counsel: (1) Government counsel failed to sequester certain witnesses; (2) Government counsel asked improper questions and elicited inadmissible testimony; (3) Government counsel made improper remarks during his opening statement and closing argument; (4) insufficient evidence supported the conspiracy conviction; and (5) Defendant was not informed that the Government would seek an enhanced sentence based on his prior felony drug convictions. The Court will then address the ground raised in Defendant's pro se filing.

### A.    Sequestration of Witnesses

Defendant first contends that the Government violated Rule 615 of the Federal Rules of Evidence because Government counsel failed to exclude Agent Kierzkowski and Detective North, who were seated at the Government's table for the duration of the trial, from the courtroom while other witnesses testified. (Doc. No. 295 at 10-12.) Defendant also argues that Government counsel violated Rule 615 because Mr. Brooks was not excluded from the courtroom during opening statements. (Id.) In response, the Government argues that it did not

violate Rule 615 because no sequestration order was in effect and because Defendant failed to request that the Court sequester any witnesses.  (Doc. No. 308 at 9.)  In addition, the Government contends that it was necessary for Agent Kierzkowski and Detective North to remain in the courtroom during the duration of the trial because they led the investigations into Defendant's drug activity and, therefore, were instrumental to the preparation and presentation of the Government's case.  (Id.)

Rule 615 provides:

> At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony.  Or the court may do so on its own.  But this rule does not authorize excluding:
>
> (a) a party who is a natural person;
>
> (b) an officer or employee of a party that is not a natural person, after being designated as the party's representative or its attorney;
>
> (c) a person whose presence a party shows to be essential to presenting the party's claim or defense; or
>
> (d) a person authorized by statute to be present.

Fed. R. Evid. 615.  Defendant has failed to identify any legal authority standing for the proposition that Rule 615 is violated – or that a reversible error occurs – where witnesses are not excluded from the courtroom despite the fact that no sequestration order was in effect and no request to exclude witnesses was made.  Although the Court is cognizant of the fact that Defendant represented himself at trial and was perhaps unaware of his ability to make such a request, the Court fully advised him at the February 3, 2012 hearing and in its June 25, 2012 order that the Court could not advise him as to how he should try his case or provide him with any assistance, that an attorney would be more capable of adequately representing him, and that

the Federal Rules of Evidence would apply at trial. (Doc. No. 234 at 13.) Accordingly, the Court must reject this ground as a basis for awarding Defendant a new trial.

### B.     Improper Questioning and Inadmissible Testimony

Defendant contends that Government counsel asked a number of improper questions and elicited inadmissible testimony. In particular, he argues that Government counsel: (1) elicited inadmissible hearsay and prior consistent statements; (2) asked leading questions; (3) inaccurately implied that certain witnesses received no benefit in exchange for their testimony; and (4) elicited irrelevant and prejudicial testimony concerning Defendant. The Court will address each argument in turn.

### 1.     Inadmissible Hearsay and Prior Consistent Statements

Defendant first contends that Government counsel offered inadmissible hearsay statements during his examination of several witnesses. (Doc. No. 295 at 3-8.) Principally, Defendant asserts that Government counsel prejudiced Defendant by improperly directing Ms. Smith, Trooper Brumbaugh, Mr. Johnson, and Detective North to read inadmissible notes to the jury regarding drug transactions involving Defendant, thereby bolstering the testimony of these witnesses. The notes read to the jury were those written by Ms. Smith, following her purchases of crack cocaine from Defendant on February 1, 2010 and February 3, 2010, and those written by Mr. Johnson, following his purchases of crack cocaine from Defendant on May 24, 2010 and May 25, 2010. The Government contends that the notes were admissible non-hearsay statements under Rule 801(d)(1)(B) of the Federal Rules of Evidence because they were offered to rebut Defendant's express and implied charges that the witnesses had lied about these transactions or had an improper motive to testify against Defendant. (Doc. No. 308 at 8.)

Hearsay is defined as a statement that "the declarant does not make while testifying at the current trial or hearing" and offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Rule 801(d)(1)(B) provides that a statement is not hearsay if it "is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." "In other words, the prior consistent statement of a witness may only be introduced into evidence against a party who has made a direct or implied charge that the witness is not credible." United States v. Asher, 854 F.2d 1483, 1506-07 (3d Cir. 1988).

Here, Defendant challenged the credibility of Ms. Smith, Trooper Brumbaugh, Mr. Johnson, and Detective North. For example, he questioned Ms. Smith regarding her criminal history and repeatedly asked Detective North why he failed to obtain tangible evidence of Defendant's involvement with drugs. (Doc. No. 268 at 77, 130.) The flaw in the Government's Rule 801(d)(1)(B) argument, however, is that Defendant made these credibility challenges during his cross-examinations of the witnesses and after Government counsel had offered, and instructed the witnesses to read, the handwritten notes. Because Government counsel offered the notes before Defendant made any express or implied charge regarding the witnesses' credibility, the notes were not admissible under Rule 801(d)(1)(B). See Asher, 854 F.2d at 1506-07; United States v. Argo, 23 F. App'x 302, 308 (6th Cir. 2001) (observing that the Government may offer a prior consistent statement under Rule 801(d)(1)(B) only after the defendant has charged that the witness's testimony had been fabricated);

Although the notes at issue were not admissible under Rule 801(d)(1)(B), the Court finds that Defendant suffered little prejudice when they were read by the witnesses or admitted into evidence. Defendant raised no objections to Government counsel's use of the notes, the

witnesses were subject to cross-examination, and, during the course of their examinations, the witnesses testified to the information contained in the notes. Therefore, the Court concludes that any error based on the Government's use of the notes does not warrant a new trial. See United States v. Perl, 492 F. App'x 37, 40-41 (11th Cir. 2012) (finding that notes taken by a witness were properly admitted where the information in the notes was testified to by the witness on the stand and the witness was subject to cross-examination). Moreover, the Court finds that there may have been adequate foundation for introduction of the notes as present sense impressions under Rule 803(1). Rule 803(1) provides that "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is not excluded by the rule against hearsay. With respect to the notes written by Ms. Smith, both she and Trooper Brumbaugh testified that she wrote the notes immediately after purchasing crack cocaine from Defendant on February 1, 2010 and February 3, 2010. Likewise, both Detective North and Mr. Johnson testified that Mr. Johnson wrote his notes immediately after purchasing crack cocaine from Defendant on May 24, 2010 and May 25, 2010. Accordingly, Government counsel elicited sufficient testimony at trial to support the conclusion that the notes were written immediately after Ms. Smith and Mr. Johnson purchased crack cocaine from Defendant and, thus, were admissible under Rule 803(1).

Next, Defendant contends that counsel for the Government improperly offered prior consistent statements during the direct examinations of Sue Warren, David Runyon, Michael Sprow, Tami Diller, Jamelle Brooks, and Monica Jones. (Doc. No. 295 at 6-8.) Before concluding the direct examination of each of these witnesses, Government counsel asked each witness whether he or she had previously relayed the information to which he or she testified to law enforcement officials. (Doc. No. 268 at 177:9-18, 185:15-24, 237:18-24; Doc. No. 269 at

280:7-8.)  Each witness answered the question in the affirmative.  Defendant contends that these inquiries constituted prior consistent statements, which served to bolster the testimony of Government witnesses.  Upon review of the trial transcript, the Court finds that Government counsel did not actually offer prior consistent statements made by these witnesses.  Instead, he merely asked them whether they had made prior statements concerning the information to which they testified at trial.  Although these inquires may have served to bolster the witnesses' credibility, Defendant cites no legal authority supporting the contention that such inquiries constitute reversible error or warrant a new trial.  In addition, Defendant cross-examined all of these witnesses and thoroughly explored their individual motivations for testifying against him.  Accordingly, the Court concludes that a new trial is not warranted on this basis.

### 2. Leading Questions

Next, Defendant argues that Government counsel asked scores of leading questions in violation of Rule 611(c) of the Federal Rules of Evidence.  Rule 611(c) provides: "Leading questions should not be used on direct examination except as necessary to develop the witness's testimony."  "A leading question suggests the answer to the person being interrogated."  <u>Fattman v. Bear</u>, 249 F. App'x 956, 958 (3d Cir. 2007).  In his brief, Defendant identifies seven instances in which Government counsel allegedly asked leading questions, the first two of which occurred during the direct examination of Ms. Smith.  Government counsel first asked Ms. Smith: "Yesterday a Trooper Brumbaugh from the Pennsylvania State Police told this jury that on three occasions, you bought drugs from this Defendant while working for him.  Is this true?"  (Doc. No. 295 at 8.)  After Ms. Smith answered in the affirmative, Government counsel asked her: "[Trooper Brumbaugh] told us the first occasion was in August of 2009.  Did you go to somebody in August 2009 to offer to assist in making controlled buys from individuals?"  (<u>Id.</u>)

The next three questions Defendant contests were asked during the direct examination of Ms. Diller. Government counsel first asked Ms. Diller: "And what was your relationship with Chuck? Did you know him to be a drug dealer." (Id. at 9.) After she answered in the affirmative, Government counsel asked: "Would you take him places to deliver drugs when he delivered drugs?" (Id.) After Ms. Diller testified that Defendant would give her "something" in return, Government counsel asked: "And when you said he would give you something, do you mean drugs?" (Id.) Finally, Defendant identifies two leading questions asked during the direct examination of Mr. Johnson. Government counsel first asked him: "Did you, in May of 2010, buy crack cocaine from Chuck for the drug task force?" (Id.) After Mr. Johnson answered in the affirmative, Government counsel asked: "And that would be on three occasions?" (Id. at 10.)

The Court agrees with Defendant that these questions were leading because they clearly suggested the answer to the witnesses. In addition, the two questions asked of Ms. Smith were improper because they not only suggested the answers but also informed her of the substance of Trooper Brumbaugh's testimony. These questions, however, did not violate Defendant's right to a fair trial. First, Defendant failed to object to any of these questions. Moreover, nearly the entirety of the direct examinations of Ms. Smith and Mr. Johnson concerned the actions they took while acting as confidential informants in purchasing drugs from Defendant on multiple occasions. Similarly, nearly all of Ms. Diller's direct examination concerned her relationship with Defendant with respect to using and distributing drugs. Although Government counsel should have phrased these questions in accordance with the Federal Rules of Evidence, the Court finds that the questions did not elicit testimony that would not have otherwise been elicited in conformance with the Rules. Accordingly, the Court will not order a new trial on this basis.

### 3.     Implication that Witnesses Were Not Receiving Any Benefits

Defendant next contends that Government counsel inaccurately implied during the direct examinations of Mr. McCollum, Ms. Diller, and Mr. Thomas that these witnesses did not receive any benefit in exchange for testifying against Defendant.  (Doc. No. 295 at 12-13.)  Government counsel and Mr. McCollum engaged in the following exchange:

> Q.     And are you currently assisting, now and then, law enforcement by making controlled purchases in other areas?
>
> A.     Yes.
>
> Q.     And how long have you been doing that?
>
> A.     For about two, maybe two years, two and a half years.
>
> Q.     Do you have any charges pending against you now?
>
> A.     At this moment they're just up in the air.  I haven't been charged with anything.
>
> Q.     Don't you have a DUI?
>
> A.     I have a DUI pending, yes.
>
> Q.     Has anybody promised you anything with regards to that?
>
> A.     No, no, no, sir.

(Doc. No. 267 at 50:21-25, 51:1-7.)  In Defendant's view, Government counsel prejudiced Defendant because he failed to fully question Mr. McCollum regarding his cooperation with law enforcement officials.  In support, Defendant points out that Mr. McCollum stated on cross-examination that he was not promised anything in exchange for his services as an informant but "was given the opportunity to work [his] charges off."  (Id. at 51:20-21.)  Mr. McCollum also stated that he was compensated for his services.  (Id. at 55:5-6.)  Although Mr. McCollum did state on cross-examination that he was provided with the opportunity to "work his charges off,"

this statement was in the context of his services as an informant over two-and-a-half years and was not limited to his testimony against Defendant. Accordingly, the Court finds that Mr. McCollum's direct examination was not inaccurate or misleading and that any perceived misleading implications were corrected by Defendant during cross-examination.

Next, Defendant contends that he was prejudiced when Government counsel elicited testimony from Ms. Diller that no charges were pending against her and that she testified against Defendant "because it's the right thing to do." (Doc. No. 295 at 12; Doc. No. 268 at 211-12.) On direct examination, Government counsel and Ms. Diller engaged in the following exchange:

> Q. Do you have a criminal record, ma'am?
>
> A. Yes.
>
> Q. For what?
>
> A. Shoplifting, intent to distribute marijuana, and all the things I was doing to support my habit, just everything. I think it was basically just shoplifting and intent to distribute marijuana and possession of a controlled substance.
>
> Q. Now, are you still on parole or probation for any of those?
>
> A. No, no, sir, no.
>
> Q. You don't have any of that –
>
> A. Not at this moment.
>
> Q. No outstanding charges on you?
>
> A. No, sir.
>
> Q. Then what's your reason for being here to testify?
>
> A. Because it's the right thing to do. I have an addiction. I'm trying to take care of that problem, and I'm trying to do the right thing, and the right thing to do is just to be honest. I did it, he did it, I did it. There's no sense lying about it.

(Doc. No. 268 at 211:17-25, 212:1-10.)  Defendant contends that Ms. Diller's answers were "not accurate and quite misleading" because Ms. Diller testified on cross-examination that she was not presently incarcerated because she was "cooperating and being honest."  (Id. at 217:6-7.)  In Defendant's view, this statement demonstrates the inaccuracy of Ms. Diller's testimony on direct examination, which Government counsel failed to correct.  Defendant, however, fails to consider the entirety of Ms. Diller's testimony on cross-examination, which makes clear that she had not been explicitly promised anything in exchange for testifying against Defendant:

> Q.  So they gave – they offered you something like a pardon or something from going to jail because you made several distributions to a certain CI?
>
> A.  I have no idea what CI, but I did cooperate.
>
> Q.  Did the officers here today offer you anything to come here today and make testimony?
>
> A.  They just asked me if I would.  I wasn't even subpoenaed, along with a lot of other people . . . .
>
> . . . .
>
> Q.  Listen, did they offer you anything for –
>
> A.  Like a tit for tat, like?  Like, if I do this, I'm off that?  No.
>
> Q.  No, just listen.  When you were discovered making these distributions, did the officers say, if you work with us or if you make testimony, we will not send you to jail?
>
> A.  They made no definite promises, but I did work with them and was a CI in other cases which had nothing to do with yours or weren't affiliated in any way.
>
> Q.  Well, why aren't you in jail now?  Because the reports it says that you were the one that actually sold the drugs to the CI.
>
> A.  You know why I'm not in jail right now?  Because I'm cooperating and being honest.  That's all I can do.

(Doc. No. 268 at 216:6-13, 216:19-25, 217:1-7.)  When read in context, Ms. Diller's statement explaining why she was not presently incarcerated related to her cooperation with law enforcement officials in cases not involving Defendant.  Thus, Government counsel's inquiry into Ms. Diller's reasons for testifying against Defendant was not inaccurate or misleading and any perceived inaccuracies were clarified during cross-examination.

Finally, Defendant argues that Government counsel improperly implied that Mr. Thomas had not benefitted from testifying against Defendant.  (Doc. No. 295 at 13.)  On direct examination, Mr. Thomas and Government counsel engaged in the following exchange:

> Q.  Do you have [any charges] hanging over your head now?
>
> A.  No, sir.
>
> Q.  Are you on probation or parole?
>
> A.  No, sir.
>
> Q.  No outstanding charges pending?
>
> A.  No, sir.
>
> Q.  Then why are you testifying here against Chuck?  I mean, who's threatening you, who's doing anything to make you say these things about him?
>
> A.  Well, because, number one, I was caught up into a sweep and a net and I was told that it would be in my best interest to testify and to set the record straight, my part in it.

(Doc. No. 268 at 228:12-23.)  According to Defendant, "[i]t is abundantly clear from this line of questioning that government counsel expected Thomas to answer the last question[] with the words 'No one.'" (Doc. No. 315 at 4.)  Mr. Thomas, however, admitted that he had been advised to testify against Defendant.  To the extent that the questioning of Mr. Thomas was improper, the Court finds that Defendant suffered no actual prejudice in light of Mr. Thomas's answer.

Accordingly, the Court will not order a new trial based on Defendant's argument that Government counsel improperly implied that Mr. McCollum, Ms. Diller, and Mr. Thomas had not benefitted from testifying against Defendant.

### 4.     Irrelevant and Prejudicial Testimony

Next, Defendant claims that Government counsel repeatedly elicited irrelevant and prejudicial testimony. First, he argues that he was prejudiced when Government counsel elicited testimony from Mr. Johnson that, following Defendant's arrest, other individuals threatened him and vandalized his vehicles, forcing him to relocate to Florida. (Doc. No. 295 at 14; Doc. No. 269 at 301:6-15.) Defendant contends that Government counsel failed to link the threats and vandalism to Defendant and, thus, the testimony was not relevant and highly prejudicial. (Doc. No. 295 at 14.) In response, the Government argues that this "testimony was offered to the jury to explain why the witness left the area and [was] not directly or implicitly tied to [Defendant]." (Doc. No. 308 at 12.) Indeed, Mr. Johnson never testified that Defendant was involved with the threats and vandalism, and Defendant did not object to this line of testimony. Defendant also thoroughly cross-examined Mr. Johnson on several matters, including Mr. Johnson's criminal history, familial relationships, upbringing, and relationship with law enforcement officials. (Doc. No. 269 at 302-10.) Defendant, thus, had ample opportunity to question Mr. Johnson about his relocation to Florida and the alleged threats he received. The Court will not order a new trial on this basis.

Next, Defendant contends that the Government offered inadmissible evidence of Defendant's past involvement with drugs. (Doc. No. 295 at 15.) In particular, he argues that Ms. Jones testified on direct examination that she sold drugs with Defendant in 2004 and that Agent Kierzkowski "gratuitously testified that he knew [Defendant's] background as a drug

dealer." (Id.)  On direct examination, Ms. Jones testified that, after she was released from prison in 2009, Defendant asked her to begin selling drugs with him again.  (Doc. No. 268 at 248:3-19.) Specifically, she stated: "He was basically, like, you know, I wonder how long it's going to take you to leave this job and start doing what we were doing awhile ago, 2004.  We were selling drugs." (Id. at 248:21-23.)  Defendant argues that Ms. Jones's reference to any events in 2004 was irrelevant and inadmissible character evidence.  (Doc. No. 315 at 7.)  With respect to Agent Kierzkowski's testimony, Defendant argues that Agent Kierzkowski testified that he knew Defendant's background as a drug dealer.  (Doc. No. 295 at 15.)  Indeed, Agent Kierzkowski testified that he knew Defendant had been "involved with drug distribution since [he had] been in Harrisburg, since 2004." (Doc. No. 269 at 425:23-25.)  Defendant, however, fails to point out that he prompted Agent Kierzkowski to make the statement that he challenges in this motion:

> Q.     Okay.  Once again . . . you allege that a drug deal was going down with the individual who picked me up and I was going over on the console giving him drugs.  How could you see all that and be driving at the same time?  I mean, you got, like contact lenses that can zero you in on that?  Is that a part of the equipment that you came down from Harrisburg with?
>
> A.     I can see the moon.  I don't know how far away it is, but I can see it.  I saw what I believe, as I drove by, activity consistent with drug dealing.  I didn't arrest you for that, I didn't charge you for that.  But in my experience, I've been doing this for 14 years, what I saw, knowing your background, knowing the case I was involved with, it looked like –
>
> Q.     My background, you don't know my background at all.
>
> A.     Oh, absolutely.
>
> Q.     No, you don't at all.

> A.    Knowing that you've been involved with drug distribution
>        since I've been in Harrisburg, since 2004, what I witnessed
>        appeared to be a drug deal.

(Id. at 425:6-25.)[1]

Rule 404(b) of the Federal Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Such evidence, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  Here, the testimony of Ms. Jones and Agent Kierzkowski was not admitted for a proper purpose.  Defendant, however, did not object to Ms. Smith's statement, which he now claims denied him a fair trial.  And the Court finds that Defendant elicited the testimony of Agent Kierzkowski that he now challenges.  Moreover, the Court instructed the jury as follows:

> You have heard some testimony regarding [Defendant's] prior involvement with law enforcement.  He is not on trial for committing any other action.  You may not consider any evidence of any other actions as a substitute for proof that the defendant committed the crimes charged here.  You may not consider this evidence as proof that [Defendant] has a bad character or any propensity to commit crimes.  Specifically, you may not use this evidence to conclude that because the defendant may have committed some other actions, he must also have committed the acts charged in the superseding indictment.  Remember that the defendant is on trial here only for the crimes charged in the superseding indictment, not for these other acts.  Do not return a guilty verdict unless the Government proves the crimes charged in the superseding indictment beyond a reasonable doubt.

(Doc. No. 282 at 72:1-16.)  The Court finds that this instruction cured any prejudice Defendant may have suffered as a result of Ms. Jones's and Agent Kierzkowski's testimony.

---

[1]  The Court also notes that, throughout his cross-examination of Agent Kierzkowski, Defendant spoke over him, interrupted him, and offered his own testimony rather than asking questions. The Court repeatedly advised Defendant to allow Agent Kierzkowski to answer the questions. (Doc. No. 269 at 420:9-10, 422:20, 424:4-6, 424:19-21426:16-18, 427:23-25.)

Finally, Defendant argues that Mr. McCollum improperly testified that Defendant had been incarcerated for about two years. (Doc. No. 295 at 28.) Mr. McCollum testified on both direct examination and cross-examination that his last purchase of crack cocaine from Defendant was approximately one week before Defendant was arrested. (Doc. No. 267 at 45, 59.) The Court finds that Defendant suffered no prejudice based on this testimony. First, Defendant himself asked Mr. McCollum: "So the last time you did a purchase with the defendant is when?" (Id. at 59:21-22.) Thus, Defendant elicited the testimony he now challenges. In addition, Detective North and Sue Warren testified about Defendant's arrest, and Defendant did not object to such testimony. Indeed, Defendant referenced his arrest at several times throughout the trial. (See Doc. No. 282 at 25-26, 34, 46-47.) Finally, the Court instructed the jury that they should draw no adverse inference from the fact that Defendant was escorted to the courtroom by law enforcement officials. (Id. at 63:25, 64:1-7.) Thus, Defendant was not prejudiced by Mr. McCollum's testimony, and the Court finds that a new trial is not warranted on this ground.

## C. Improper Remarks During Closing Argument and Opening Statement

Defendant next argues that Government counsel made several improper remarks during his closing argument and opening statement that warrant a new trial. The Court will first address the remarks made during closing argument and then those made during his opening statement.

### 1. Closing Argument

First, Defendant contends that Government counsel improperly advised the jury that they could convict Defendant by a preponderance of the evidence rather than by finding him guilty beyond a reasonable doubt. (Doc. No. 295 at 20-21.) Defendant bases this argument on the following portion of Government counsel's closing argument:

> You . . . are the finders of fact. Anything that is testified to on the
> stand you can consider. You decide what you believe or you don't

> believe. You are the finders of fact, but you are not searchers for
> doubt. Now, what does that mean? What I'm saying is, if you find
> a fact and you believe it and you accept it, you should not be trying
> to determine whether – or what the doubt is. If you accept it and
> it's proven, then you have fulfilled your role as finders of fact in
> this particular case.

(Doc. No. 282 at 5:11-20.) Even if there were some risk of prejudice with respect to

Government counsel's statements, this type of prejudice can be cured with proper jury

instructions, and "juries are presumed to follow [the court's] instructions." Richardson v. Marsh,

481 U.S. 200, 211 (1987). The Court instructed the jury in detail regarding the standard of

beyond a reasonable doubt and judging the credibility of witnesses. (Doc. No. 282 at 67-70, 73-

74.) Accordingly, the Court concludes that these instructions sufficed to cure any possibility of

prejudice. Zafiro v. United States, 506 U.S. 534, 540-41 (1993).

Second, Defendant contends that Government counsel improperly stated during his

closing argument that the jury, in assessing each witness's credibility, should consider whether

each witness's testimony was consistent with that of other witnesses. (Doc. No. 295 at 22.)

Specifically, Defendant points to a portion of Government counsel's closing argument in which

Government counsel asked the jury to consider whether the testimony of certain witnesses

"meshed" together, thereby making the testimony more credible. (Doc. No. 282 at 9:21-25,

10:1-21.) Defendant also contends that Government counsel committed prosecutorial

misconduct by arguing that the witnesses were more credible because they were questioned by

Defendant himself rather than by an attorney representing Defendant.

The United States Court of Appeals for the Third Circuit has given prosecutors

"considerable latitude" in laying out the evidence and suggesting to a jury that they may draw

permissible inferences from the evidence. United States v. Green, 25 F.3d 206, 210 (3d Cir.

1994). A prosecutor may not suggest that a witness is credible based on either his personal

knowledge or information not contained in the record.  <u>United States v. Lee</u>, 61 F.3d 170, 195

(3d Cir. 2010).  Here, the Court finds that Government counsel's arguments do not constitute

prosecutorial misconduct warranting a new trial.  Defendant cites no legal authority supporting

his argument and fails to consider that one of the jury's roles is to evaluate the credibility of

witnesses.  Indeed, the Court instructed the jury that they

> may decide whether to believe a witness based on his or behavior
> and manner of testifying, the explanations the witness gave, and all
> the other evidence in the case just as you would in any important
> matter where you're trying to decide if a person is truthful,
> straightforward, and accurate in his or her recollection.

(Doc. No. 282 at 67:8-13.)  The Court also instructed the jury that they may consider a number

of factors, including a witness's appearance and manner while testifying, whether the witness has

any motive, bias, or prejudice, and whether the witness's testimony was inconsistent or

consistent with other evidence that they believed.  (<u>Id.</u> at 67:16-25, 68:1-3.)  Thus, the jury was

clearly instructed that it is within their discretion to accept or reject a witness's testimony based

on a number of considerations.  To the extent that it was improper for Government counsel to

argue that the jury should find witnesses more credible because Defendant – rather than a trained

attorney – questioned them, the Court finds that this argument did not likely have a substantial

effect on the outcome of the trial in light of the Court's detailed instructions regarding

Defendant's <u>pro se</u> status and the assessment of witnesses.

Third, Defendant argues that Government counsel improperly argued to the jury that

confidential informants do not often testify in drug trials.  During his closing argument,

Government counsel stated:

> A lot of times in drug prosecutions the agent who is involved in the
> investigation will testify about their investigation and the use of a
> confidential informant, but you won't ever hear from the
> confidential informant.  They'll be talking about using a CI,

> sending a CI to meet with somebody, the CI coming back giving them drugs. And they do that often to protect the confidential informant because they may use the confidential informant in other transactions. We presented the confidential informant to you so you could listen directly to the confidential informant.

(Id. at 10:23-25, 11:1-7.) In Defendant's view, this argument was improper because no trial evidence suggested that confidential informants do not regularly testify in trials. To the extent that it was improper for Government counsel to suggest that the Government's case was stronger because confidential informants testified against Defendant, the Court finds that Defendant suffered little prejudice as a result. As discussed, prosecutors are "entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991). Counsel, however, should not introduce information based on personal belief or knowledge. Zehrbach, 47 F.3d at 1265 n.11. Even if a prosecutor goes too far, "[p]rosecutorial misconduct does not always warrant the granting of a mistrial. The Supreme Court has acknowledged that given 'the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial.'" Id. at 1265. The Third Circuit has adopted a two-part test for determining improper vouching: "1) the prosecutor must assure the jury that testimony of a government witness is credible; and 2) this assurance must be based on either the prosecutor's personal knowledge or other information not contained in the record." United States v. Saada, 212 F.3d 210, 225 (3d Cir. 2000); United States v. Molina-Guevara, 96 F.3d 698, 704-05 (3d Cir. 1996).

The Court finds that Government counsel referred to his own experience in other trials in order to bolster the credibility of Ms. Jones and Mr. Johnson, the two confidential informants who testified against Defendant. While impermissible, the Third Circuit has analyzed similar

remarks as non-constitutional error.  United States v. Lee, 612 F.3d at 195 n.30; United States v. Dispoz-O-Plastics, Inc., 172 F.3d 275, 286 (3d Cir. 1999) ("[The Third Circuit] en banc has held that vouching that is aimed at the witness's credibility and is based on extra-record evidence is deemed non-constitutional error." (citing Zehrbach, 47 F.3d at 1265).  Non-constitutional error is harmless if "it is highly probable that the error did not contribute to the judgment."  Lee, 612 F.3d at 194.  The prosecutor's reference to the fact that confidential informants do not often testify in drug trials was brief, Defendant failed to object to the reference, and the prosecutor did not return to the topic.  Moreover, the Court instructed the jury before their deliberations that the statements and arguments of the lawyers was not evidence.  Recognizing that there can be no such thing as an error-free trial, the Court concludes that the prosecutor's improper comments did not substantially affect the outcome of the trial.

Finally, the Court finds that a new trial is not warranted based on Government counsel's references to the high-profile cases of the Menendez brothers and Jerry Sandusky.  Although it was certainly improper for Government counsel to make any comparison between Defendant's alleged crimes and those of much more notorious criminal defendants, Defendant objected to the latter reference, and the Court sustained the objection.  (Doc. No. 282 at 58.)  In addition, the Court instructed the jury that the arguments of the lawyers were not evidence and that their verdict must be based on the evidence produced at trial.  Thus, Government counsel's fleeting references to these cases did not likely have a substantial effect on the jury's verdict.

### 2.      Opening Statement

Defendant also contends that Government counsel made three statements during his opening statement that warrant a new trial.  First, he argues that it was not proper for Government counsel to introduce himself as "an Assistant United States Attorney here in the

Middle District of Pennsylvania . . . [for] just about 25 years now, and my experience has been all in criminal prosecution."  (Doc. No. 278 at 82:4-5, 82:11-13.)  According to Defendant, these remarks "had the effect of bolstering the government's case since the clear implication was that such an experienced criminal prosecutor would not be prosecuting [Defendant] unless [Defendant] were guilty."  (Doc. No. 295 at 28.)  To the extent that Government counsel's reference to his years of experience as an Assistant United States Attorney was improper, the Court finds that any prejudice suffered by Defendant was cured by the Court's instructions regarding the presumption of innocence to which Defendant was entitled.

Second, Defendant contends that it was improper for Government counsel to suggest that Defendant may testify during the trial.  Specifically, Government counsel stated: "[Defendant is] entitled to you listening to his questions, any testimony he might present or witnesses he may call, and any argument he may make."  (Doc. No. 278 at 96:22-24.)  Although it would have been more prudent for Government counsel to not mention the possibility of Defendant testifying at trial, the Court finds that this remark did not likely have a substantial effect on the verdict.  During its preliminary instructions, the Court informed the jury that Defendant had chosen to exercise his constitutional right to represent himself, that this decision should have no effect on the jury's consideration of the case, and that Defendant will proceed as any other lawyer would in defending against the charges.  (Id. at 68:11-25.)  In addition, the Court instructed the jury in its final instructions that Defendant's decision to represent himself "has no bearing on whether he is guilty or not guilty, and it must not affect your consideration of the case."  (Doc. No. 282 at 60:21-23.)  The Court also instructed the jury that "[t]he only evidence in the case is the testimony of witnesses under oath and exhibits that were admitted into evidence."  (Id. at 60:24-25, 61:1-5.)  These instructions made clear that the jury was only to consider the evidence

produced at trial in determining whether Defendant was guilty of the charges.  Because juries are presumed to follow such instructions, the Court will not grant a new trial on this basis.  See, e.g., Richardson, 481 U.S. at 211.

Finally, Defendant contends that it was improper for Government counsel to state that Defendant was not being forced to represent himself.  (Doc. No. 295 at 29.)  Specifically, Government counsel told the jury:

> [W]hen Mr. Staten was asked [during voir dire] if he had any questions of you, he said he was forced to represent himself.  You heard Judge Kane tell you he has elected to represent himself.  Nobody is making him represent himself.  One of the prospective jurors had some concern over that.  No one is forcing him to represent himself.  He has the right, and there was an extensive discussion of that between the defendant and Judge Kane.
>
> So to the extent that he might have given you the impression that he was brought here having to defend himself, that is wrong.  Listen to him, though.  He's entitled to you listening to his questions, any testimony he might present or witnesses he may call, any argument he may make.

(Doc. No. 278 at 96:12-24.)  Indeed, during voir dire, Defendant introduced himself to the prospective jurors and explained: "I feel as though I had to represent myself because my attorney didn't want to give me the help that I needed.  He didn't want to actually be my advocate, he wanted to actually be an assistant of the prosecutor, so I had to represent myself."  (Id. at 55:16-19.)  Although it would have been more cautious for Government counsel to request a jury instruction from the Court regarding Defendant's decision to represent himself, the Court finds that these remarks were not sufficiently improper to warrant a new trial in light of the Court's preliminary and final jury instructions regarding this issue.

**D.      Conspiracy Conviction**

Count II of the superseding indictment charged that Defendant, Anias Foster, Corey Palm, and Jason Simmons "did intentionally and knowingly unlawfully combine, conspire, confederate and agree with each other, and with persons both known and unknown to the grand jury, to manufacture, distribute and possess with the intent to manufacture and distribute at least 280 grams of a mixture and substance containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II controlled substance."  (Doc. No. 28 at 2.)  Defendant raises the following arguments in relation to this charge: (1) the evidence at trial was not sufficient to convict him of this charge; (2) Government counsel offered irrelevant bad acts of his alleged co-conspirators; and (3) Government counsel offered inadmissible opinion evidence concerning this charge.  The Court will address each argument in turn.

**1.      Sufficiency of the Evidence**

Defendant was convicted of conspiracy to distribute or possess with intent to distribute crack cocaine in violation of 21 U.S.C. § 846.  He contends that the Government failed to prove that he agreed to participate with any of the individuals identified in the superseding indictment in the unlawful distribution of crack cocaine.  Alternatively, Defendant argues that, to the extent that the Government proved that Defendant agreed to participate with individuals not identified in the superseding indictment to distribute crack cocaine, such proof was not sufficient to support his conviction because it was evidence of a conspiracy not charged in the indictment.

"In order to obtain a conviction for conspiracy, the government must show a 'unity of purpose between the alleged conspirators, the intent to achieve a common goal, and an agreement to work together toward that goal."  United States v. Kama, 251 F. App'x 121, 123 (3d Cir. 2007) (internal brackets and quotation marks omitted).  "The government must prove

each element beyond a reasonable doubt, but may do so solely by circumstantial evidence."

United States v. Dent, 149 F.3d 180, 188 (3d Cir. 1998).  In addition, a defendant may be

convicted of conspiracy even if the identities of his or her co-conspirators are not known.

Karma, 251 F. App'x at 123; United States v. Obialo, 23 F.3d 69, 72 (3d Cir. 1994); United

States v. Allen, 613 F.2d 1248, 1352 (3d Cir. 1980).  Indeed, the United States Supreme Court

has held that "the identity of the other members of the conspiracy is not needed, inasmuch as one

person can be convicted of conspiring with persons whose names are unknown."  Rogers v.

United States, 340 U.S. 367, 375 (1951).

The evidence presented at trial provided a substantial basis for a reasonable jury to find

beyond a reasonable doubt that Defendant engaged in a conspiracy with one or more persons.

The evidence established that Benjamin Thomas introduced Defendant to Jamelle Brooks and

drove Defendant to Harrisburg on more than one occasion so that Defendant could purchase

crack cocaine from Mr. Brooks.  (Doc. No. 268 at 223:6-8, 223:18-19, 224:18-20.)  Mr. Brooks

testified that he sold Defendant one or two ounces of crack cocaine to Defendant on a bi-weekly

basis over a period of approximately six to eight months.  (Id. at 234:10-24, 235:4-17, 242:1-4.)

According to Mr. Brooks, none of his other customers purchased such large quantities of crack

cocaine.  Monica Jones also testified that Mr. Brooks was Defendant's source of supply and that,

upon Defendant's request, she traveled to Harrisburg to purchase crack cocaine from Mr. Brooks

on a regular basis.  (Doc. No. 269 at 272:21-24, 273:3-5.)  Numerous witnesses, including

Clarissa Smith, Joseph Jerome Johnson, David Runyon, Michael Sprow, and Sue Warren,

testified that Defendant sold crack cocaine to them.

When viewed in the light most favorable to the Government as the verdict winner, as the

Court must, substantial evidence existed for a rational jury to find beyond a reasonable doubt that

Defendant knowingly and purposefully agreed to distribute crack cocaine with one or more persons and that at least one overt act was done in furtherance of the conspiracy. <u>Obialo</u>, 23 F.3d at 71-72. The fact that the Government failed to offer evidence – and stipulated to the fact – that Defendant personally knew or had direct dealings with his alleged co-conspirators is not fatal to his conspiracy conviction.[2] As Government counsel stated during his closing argument, "the criminal conspiracy . . . [was] limited to Mr. Jamelle Brooks, who testified that he was this defendant's source of supply . . . and that he got it from another named co-conspirator, Corey Palm . . . . And they supplied distribution amounts of drugs to the defendant, who was brought there by Ben Thomas, took it back to the community where it was distributed . . . ." (Doc. No. 282 at 12:25, 13:1-8.) Even assuming absolutely no involvement of Anias Foster, Jason Simmons, and Corey Palm, this evidence shows the participation of at least one person other than Defendant in the distribution of crack cocaine. The relevant question "is not whether there was sufficient evidence that [Defendant] conspired with [Anias Foster, Jason Simmons, or Corey Palm], but whether there was sufficient evidence that he conspired with some other person." <u>Allen</u>, 613 F.3d at 1253. Accordingly, the Court will not grant a new trial on the basis that insufficient evidence supported the conspiracy conviction.[3]

---

[2] The Court also instructed the jury that "[h]ad these witnesses appeared and testified, they would have testified to these facts and would agree that any wrongdoing to which they have admitted did not involve Defendant." (Doc. No. 282 at 84:5-8.)

[3] Defendant also argues that Government counsel improperly argued during his closing argument that Defendant could conspire with Corey Palm without ever meeting him or agreeing to participate in the distribution of crack cocaine with him. (Doc. No. 295 at 23-24.) Utilizing the same arguments he advanced in support of his argument based on insufficiency of the evidence, Defendant emphasizes that "no evidence offered at trial [showed] that [Defendant] had anything to do with Palm or had any idea from whom or where Palm was obtaining his drugs." (<u>Id.</u>) Assuming <u>arguendo</u> that the Government failed to prove any connection or agreement between Defendant and Mr. Palm, the Court finds that Government counsel's argument did not prejudice Defendant because there was sufficient evidence at trial to support a jury finding that Defendant conspired with one or more persons.

## 2.    Bad Acts of Alleged Co-Conspirators

Defendant also argues that a new trial is warranted because Agent Kierzkowski testified that he searched a storage locker belonging to Anias Foster and Corey Palm and found $150,000 in cash and firearms inside the locker.  Defendant argues that this testimony was not relevant and highly prejudicial to Defendant because Agent Kierzkowski also testified that no evidence indicated that Defendant had any involvement with the cash or firearms.  (Doc. No. 295 at 13-14.)  As discussed, the Government stipulated to the fact – and the Court instructed the jury – that Defendant never met Mr. Foster and never had direct dealings with Mr. Palm.  (Doc. No. 282 at 83:24-25, 84:1-4.)  The Court also instructed the jury to "not consider any evidence of any other actions [of Defendant] as a substitute for proof that the defendant committed the crimes charged here . . . . Remember that the defendant is on trial here only for the crimes charged in the superseding indictment, not for these other acts."  (Doc. No. 282 at 72:3-14.)  During his closing argument, Government counsel also advised the jury to not consider Agent Kierzkowski's testimony concerning the storage locker in determining whether Defendant was guilty of conspiring to distribute or possess with intent to distribute crack cocaine.  (Id. at 13:9-13.)  To the extent that Agent Kierzkowski's testimony concerning the storage locker was prejudicial, the Court finds that its instructions and the Government's stipulation cured any possible prejudice suffered by Defendant.  See United States v. Liburd, 607 F.3d 339, 344 (3d Cir. 2010) ("[W]hile curative instructions cannot repair every error, we do generally presume that juries follow their instructions.").   Thus, the Court will not grant a new trial on this ground.

## 3.    Opinion Testimony

Defendant next argues that Agent Kierzkowski offered inadmissible opinion testimony that Defendant was a member of a drug conspiracy with Mr. Jones, Mr. Brooks, Anias Foster,

Corey Palm, and others and, therefore, was guilty of the conspiracy offense. (Doc. No. 295 at

15.) The Court disagrees. Agent Kierzkowski testified as follows regarding the connection

between Defendant and these individuals:

> Q: Let me ask you then, the indictment in this case alleges other co-conspirators, an Anias Foster known as Nizz, a Corey Palm known as Bodie. Was there a separate but concurrent in time investigation going on in Harrisburg of those individuals?
>
> A. Yes.
>
> Q. And after – can you tell us about that generally?
>
> A. Unfortunately, you know, I'm one of eight guys and agents in the Harrisburg office. We cover 16 counties in the Middle District. A lot of our cases take us out of the Middle District and into different states and sometimes overseas. I was working a separate parallel investigation in Harrisburg with the Dauphin County Drug Task Force on Anias Foster, Corey Palm known as Bodie, and a group of individuals in Harrisburg. They were a Harrisburg-based crack cocaine distribution organization.
>
> Q. At this time you were working them had you any idea that . . . there was a connection between this Defendant and that separate investigation?
>
> A. No, not initially.
>
> Q. And the defendant was arrested on June 16, 2010. When were you able to determine if there was a connection?
>
> A. After we had utilized Monica Jones to conduct a buy-bust operation of Mr. Jamelle Brooks, also known as King, and King's source of supply was an individual named Bodie, who I knew was Anias Foster's nephew named Corey Palm, and that was the link into two active investigations now melting into one.

(Doc. No. 269 at 377:8-25, 378:1-9.) Upon review of this testimony, the Court finds that Agent

Kierzkowski did not express his personal opinion that Defendant was guilty of the conspiracy

offense.  Instead, Agent Kierzkowski explained the link between Defendant and his alleged co-conspirators.  Even if Agent Kierzkowski expressed a personal opinion, the Court notes that Defendant had a full and fair opportunity to cross-examine him on this issue.  In fact, Defendant aggressively questioned Agent Kierzkowski on his involvement in the investigation, his knowledge of Defendant, and his career experience, repeatedly pointing out that Agent Kierzkowski lacked tangible evidence demonstrating Defendant's involvement in drug distribution.  (Id. at 380-81, 425-27.)  In doing so, Defendant repeatedly emphasized that Agent Kierzkowski failed to obtain video or photo evidence showing Defendant selling drugs, thereby challenging Agent Kierzkowski's credibility.  Thus, the Court finds that Defendant was not prejudiced and that a new trial is not warranted on this ground.

**E.**     **Enhanced Sentence**

Finally, Defendant contends that his prior attorneys failed to advise him that the Government could seek an enhanced sentence based on his prior felony drug convictions or that the Government filed such an information seeking an enhanced sentence.  (Doc. No. 295 at 29-30.)  This argument has no merit.  The Court's June 25, 2012 order – issued after Defendant elected to represent himself at trial – provides the potential penalties associated with the charges contained in the superseding indictment.  In addition, the order stated that the Government filed an Information to establish prior convictions pursuant to 21 U.S.C. § 851 on February 29, 2012, and that "[t]his filing places Defendant Staten on notice that if he is convicted under Count I and/or Count II, the Government will seek an enhanced sentence based on his prior felony drug offenses."  (Doc. No. 234 at 15.)  The order goes on to explain the enhanced sentence in detail.  (Id.)  The Court will not grant a new trial on the basis that Defendant failed to review a court order issued after he was acting as his own counsel.

**F.     Defendant's <u>Pro</u> <u>Se</u> Arguments**

Defendant also filed a <u>pro</u> <u>se</u> motion for a new trial or, in the alternative, to vacate

judgment of conviction.[4]  (Doc. No. 289.)  Although the Court finds no merit to any of the

arguments raised in this motion, the Court will write briefly to address them.

First, Defendant raises a number of arguments that were also raised and briefed by his

appointed counsel, including that the Government failed to present sufficient evidence to support

a conspiracy conviction, that several witnesses offered inadmissible testimony, and that it was

improper for witnesses to reference the fact that Defendant is presently incarcerated.  (Doc. No.

289 at 3-4.)  The Court, having fully addressed these issues, will not further address them here.

Second, Defendant argues that he was denied a fair trial because a juror saw him outside

the courtroom handcuffed and dressed in his prison uniform.  (<u>Id.</u> at 2.)  This argument lacks

merit.  The Court informed counsel, outside the presence of the jury, on the morning of the third

day of the trial that the United States Marshals believed that a juror had seen Defendant in the

hallway in handcuffs.  (Doc. No. 269 at 264.)  The Court then explained that the situation could

be handled in one of two ways:

> If I can identify which juror it is, I can speak with him individually
> and tell him he should draw no adverse inference from that fact, or
> I could offer a general instruction at the conclusion of the trial with
> all of my instructions advising the jurors that they may have
> observed some individuals associated with the trial being escorted
> and perhaps even restrained, and they should not draw any adverse
> inference from that.

(<u>Id.</u> at 264:23-25, 265:1-6.)  Both Government counsel and Defendant stated that they preferred

the second option.  (<u>Id.</u> at 265:8-10.)  The Court gave such an instruction at the conclusion of the

---

[4] Defendant also filed a letter with the Court, stating: "I know longer desire for Mr. Becker to
utilize his expertise in the form of contriving a post trial motion to obtain a new trial . . . . I ask
the Court to disregard any motion that was filed by Mr. Becker."  (Doc. No. 288.)  In an
abundance of caution, the Court fully reviewed the arguments advanced in both motions.

trial. (Doc. No. 282 at 63:25, 64:1-7.) Defendant was fully aware of the situation and did not object to the Court's course of action. Therefore, the Court is satisfied that this instruction was sufficient to cure any potential prejudice and, thus, will not grant a new trial on this ground.

Third, Defendant raises a number of baseless contentions, including that the Government engaged in fraud on the court by "contriving a superseding [indictment]," that Government counsel was "mischievous" in his presentation of his case-in-chief, that Agent Kierzkowski and Detective North lacked the authorization to conduct a wiretap investigation, that he was arrested in the absence of a valid warrant, that Agent Kierzkowski perjured himself before the grand jury, and that the drugs presented as exhibits during the trial were not the same drugs that Defendant allegedly sold to the witnesses. Defendant raised nearly all of these issues at trial, and the Court gave Defendant considerable latitude in exploring them at trial despite the fact that he failed to present any evidence, or elicit any testimony, in support of them. Finding that Defendant was not prejudiced, a new trial is not warranted on any of these grounds.

Finally, Defendant contends that his prior attorneys and the Court worked in conjunction to deprive him of his right to a speedy trial in violation of the Sixth Amendment. This argument is entirely without merit. As discussed, Defendant refused to cooperate with his appointed attorneys and raised numerous nonsensical arguments in written filings and at court hearings. Indeed, a number of the continuances granted in this case are attributable to Defendant himself. Defendant's refusal to assist in the preparation of his trial, continuous filing of letters containing baseless requests for irrelevant information, and contentious attitude significantly delayed the trial in this case. The Court will, therefore, not order a new trial on this basis.

**IV.     CONCLUSION**

Defendant's trial was not perfect or error free, but the Constitution does not guarantee him such a trial.  <u>Zehrbach</u>, 47 F.3d at 1265.  The Court has fully reviewed the record and the arguments advanced in support of a new trial and finds that none of the alleged errors, either individually or in combination, had a substantial effect on the outcome of the trial.  Accordingly, the Court will not exercise its discretion in ordering a new trial under Rule 33(a) of the Federal Rules of Criminal Procedure and will deny the motions for a new trial.  An order consistent with this memorandum follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **No. 1:10-cr-00179** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **CHARLES HERMAN STATEN,** | : | |
| Defendant | : | |

**ORDER**

      **AND NOW**, on this 19th day of April 2013, **IT IS HEREBY ORDERED THAT**

Defendant's motions for a new trial (Doc. Nos. 289, 290) are **DENIED**.  **IT IS FURTHER**

**ORDERED THAT** a sentencing proceeding will be held on May 21, 2013, at 1:30 p.m., in

Courtroom No. 4, Federal Building and Courthouse, 228 Walnut Street, Harrisburg,

Pennsylvania 17108.


                                  s/ Yvette Kane
                                  Yvette Kane, Chief Judge
                                  United States District Court
                                  Middle District of Pennsylvania